**CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, Plaintiff,**

v.

**The SHILOH GROUP, LLC, et al., Defendants.**

**Case No. 16–cv–06499–DMR**

United States District Court, N.D. California.

Signed 07/24/2017

Andrew L. Packard, William Nazar Carlon, Law Offices of Andrew L. Packard, Petaluma, CA, Reed Wayne Super, Super Law Group, LLC, New York, NY, for Plaintiff.

Linda Catherine Beresford, Environmental Law Group LLP Varco & Rosenbaum, San Diego, CA, for Defendants.

## ORDER RE DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

Donna M. Ryu, United States
Magistrate Judge

Plaintiff California Sportfishing Protection Alliance ("Plaintiff"), a non-profit environmental organization, filed this citizen suit against Defendants The Shiloh Group, LLC ("TSG") and Thomas Nelson ("Nelson") (collectively "Defendants") seeking to enforce the Clean Water Act ("CWA"). According to Plaintiff, Defendants own and operate a large industrial park that unlawfully discharges polluted storm water associated with industrial activities in violation of the CWA.

Defendants now move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Motion to Dismiss ("MTD") [Docket No. 8]. Plaintiff opposes the motion to dismiss, and also moves for leave to file a First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 15. Motion to Amend ("MTA") [Docket No. 29]. Having considered the parties' submissions as well as oral argument, and for the reasons stated below, the court **DENIES** Defendants' motion to dismiss, and **GRANTS** Plaintiff's motion to amend.

## I. FACTUAL AND PROCEDURAL HISTORY

In response to Defendants' motion to dismiss, Plaintiff submitted its opposition brief and also filed a motion for leave to amend the complaint, along with a proposed FAC. Given that the motion to dismiss and motion for leave to amend are heavily intertwined, and in light of the fact that the court grants leave to file the FAC, the court sets forth the relevant facts based on the FAC, the exhibits attached to the FAC, and judicially noticeable documents. In the interests of clarity and judicial efficiency, the court will analyze the sufficiency of the allegations in the FAC rather than the complaint. For the purposes of adjudicating these motions, the court accepts the allegations in the FAC as true, except with respect to the analysis of the jurisdictional issue of mootness, as discussed below.

The court discusses the CWA in more detail below, and sets forth this brief background to provide context for the relevant facts. The CWA is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, Section 301(a) of the CWA prohibits the "discharge of any pollutant" into navigable waters from any "point source" unless certain statutory exceptions apply. See 33 U.S.C. §§ 1311(a), 1362(12). "One such exception is for discharges by entities or individuals who hold [National Pollutant

Discharge Elimination System, or NPDES] permits." *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 673 F.3d 880, 891 (9th Cir. 2011), *rev'd on other grounds sub nom. Los Angeles Cty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78, 133 S.Ct. 710, 184 L.Ed.2d 547 (2013); *see also* 33 U.S.C. § 1342. For storm water discharge, a permit is required only if the discharge falls into one of five categories. *See* 33 U.S.C. § 1342(p)(2)(A) through (E) (listing the five categories of storm water discharges that are subject to the permit requirement). One of these categories is storm water associated with "industrial activity." *See* 33 U.S.C. § 1342(p)(2)(B). The relevant EPA regulation, 40 C.F.R. § 122.26(b)(14), defines "storm water discharge associated with industrial activity [as] the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." The regulation sets forth categories of facilities which are considered to be engaging in "industrial activity," and identifies those industrial activities mainly by "Standard Industrial Classification" codes, otherwise known as SIC codes.

Defendants own and operate a 31–acre industrial park located at 930 Shiloh Road in Windsor, California (the "Facility"). FAC ¶¶ 10, 51 [Docket No. 37–1]. Defendants lease industrial lots at the Facility to approximately 60–80 tenant businesses. FAC ¶ 10. Industrial activities occur throughout the Facility and contribute to polluted storm water discharges. *Id.* ¶¶ 51–54, 61–64. These industrial activities include or have included fencing installation, wood pallet construction, structural rebar assembly, auto repair, and trucking operations. *Id.* ¶ 51. The industrial activities fall under a number of SIC codes, *see* 40 C.F.R. § 122.26(b)(14), depending on which businesses are operating at the Facility at a given time. FAC ¶ 52; *see also* First 60–Day Notice at 3–4 (Ex. A to FAC) (listing SIC codes for the industrial activities occurring at the Facility as of June 25, 2015) [Docket No. 29–2].

According to Plaintiff, as owners and operators of the Facility, Defendants maintain and control the Facility's common infrastructure including its ditches and pipes, and thereby control the discharges of storm water associated with industrial activities that flow from the Facility into waters covered by the CWA. FAC ¶¶ 54–64. The Facility discharges polluted storm water associated with the industrial activities in a number of ways. For example, the Facility has multiple subsites containing polluted soil from past industrial activities. *Id.* ¶ 54. Although some of these subsites are the subject of environmental remediation efforts, they remain exposed to storm water and storm water flows. *Id.* ¶ 54. Additionally, the Facility has ditches and pipes that collect and combine storm water from different parts of the Facility, *see id.* ¶ 57, and a paved road that runs throughout the Facility on which storm water collects and flows north into the Pruitt Creek. *Id.* ¶ 58. Moreover, because the Facility does not have "essential structural controls such as grading, berming, and roofing" to prevent storm water from coming into contact with contaminants and pollutants created by the industrial activities when it rains, *id.* ¶ 73, storm water flows across materials associated with industrial activities, becomes contaminated, and leaves the Facility. *Id.* The polluted storm water discharges from the Facility through concrete conveyances into the Pruitt Creek, which joins Pool Creek and Windsor Creek, both of which drain into Mark West Creek, which drains into the Russian River. *Id.* ¶¶ 50–51, 64; *see also* First 60–Day Notice at 4.

Starting in 2002, Defendants maintained a permit for the Facility's storm water discharges under California's statewide general permit for industrial activities ("General Permit"). *See* FAC ¶ 65; December 9, 2002 Receipt of Notice of Intent (Ex. B to Pltf's RJN) [Docket No. 17]. Under the General Permit, a permit holder must comply with three requirements: "1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report." FAC ¶ 31.

According to Plaintiff, although Defendants continuously have maintained coverage under the General Permit since 2002, they have failed to comply with the General Permit requirements, notwithstanding their expressed intent to abide by them. Plaintiff claims that Defendants have repeatedly and consistently exceeded discharge prohibitions, receiving water limitations, and effluent limitations, and have failed to develop and implement adequate SWPPPs. *See* First 60–Day Notice at 4–13; *see e.g.*, FAC ¶¶ 68, 73–78.

On September 7, 2016, in order to address these and other violations of General Permit requirements, Plaintiff served Defendants with a 60–Day Notice of its intention to file a private citizen lawsuit to enforce the CWA. *See* First 60–Day Notice.

On November 7, 2016, in response to Plaintiff's First 60–Day Notice, Defendants submitted a Notice of Termination ("NOT") of their coverage under the General Permit to the California State Water Resources Control Board ("SWRCB"). *See* November 7, 2016 NOT (Ex. B to Defs' First RJN) [Docket No. 8–4].

A day later, on November 8, 2016, Plaintiff filed this citizen suit alleging four claims under the CWA for discharging polluted storm water associated with industrial activity in excess of the limits set forth in the General Permit, and for failing to implement the plans required under the General Permit necessary to reduce and/or prevent the discharge of pollutants in storm water discharges associated with industrial activity.

On December 9, 2016, Plaintiff served Defendants with its Second 60–Day Notice, alleging that Defendants violated the CWA by unlawfully discharging storm water associated with industrial activities without a required permit. *See* Second 60–Day Notice (Ex. B to FAC) [Docket No. 29–3].

On December 21, 2016, Defendants moved to dismiss the complaint on the ground that the action is moot because Defendants terminated their coverage under the General Permit prior to the filing of the lawsuit, and therefore could no longer be held liable under the CWA for violating the General Permit as alleged in the complaint. Defendants also moved to dismiss the complaint on the ground that it failed to state a claim. According to Defendants, as passive landlords who merely own a facility, they are not liable under the CWA for the pollution created by tenants.

On February 8, 2017, Plaintiff moved for leave to file the FAC. Like the original complaint, the FAC alleges that Defendants violated the CWA by failing to comply with the requirements of the General Permit by discharging storm water associated with industrial activities. *Compare* FAC ¶¶ 80–104 *with* Compl. ¶¶ 57–81. In addition, the FAC alleges in the alternative that Defendants violated the CWA by failing to obtain permit coverage for discharges of storm water associated with industrial activities. *See, e.g.*, FAC ¶¶ 71, 105–09.

## II. LEGAL STANDARDS

### A. Rule 12(b)(1)

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A court will dismiss a party's claim for lack of subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation and quotation marks omitted). When reviewing a 12(b)(1) motion, the court sculpts its approach according to whether the motion is "facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A facial challenge asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). By contrast, a factual attack disputes "the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge permits the court to look beyond the complaint, without "presum[ing] the truthfulness of the plaintiff's allegations." *White*, 227 F.3d at 1242 (citation omitted). Even the presence of disputed material facts "will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (citations omitted).

In moving to dismiss Plaintiff's action as moot under Rule 12(b)(1), Defendants contest the truthfulness of Plaintiff's allegations that they violated the CWA by discharging polluted storm water associated with industrial activities in excess of the limits in the General Permit. Defendants submit extrinsic evidence which purportedly establishes that Defendants were not covered by the General Permit at the time the complaint was filed. Defendants argue that this renders the lawsuit moot. Accordingly, Defendant's jurisdictional attack is factual in nature. The court therefore does not "presume the truthfulness" of Plaintiff's allegations, *White*, 227 F.3d at 1242, and may look beyond Plaintiff's complaint to resolve the jurisdictional dispute. *Roberts*, 812 F.2d at 1177.

### B. Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock Inc.*, 349 F.3d 1191, 1199–2000 (9th Cir. 2003). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) (citation omitted), and may dismiss the case "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation and quotation marks omitted).

When a complaint presents a cognizable legal theory, the court may grant the motion if the complaint lacks "sufficient factual matter to state a facially plausible claim to relief." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A claim has facial plausibility when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted).

For purposes of Rule 12(b)(6) review, the court reviews documents incorporated

into the complaint, as well as judicially noticeable material. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005) (incorporation by reference); *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012) (judicial notice). The court may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## C. Leave to Amend

Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter of course, at least until the defendant files a responsive pleading. Fed. R. Civ. P. 15(a)(1). After that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be given "freely...when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted). In the absence of an "apparent reason," such as undue delay, bad faith or dilatory motive, prejudice to the opposing party, futility of the amendments, or repeated failure to cure deficiencies in the complaint by prior amendment, it is an abuse of discretion for a district court to refuse to grant leave to amend a complaint. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999). These factors do not "merit equal weight," and "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capi-*

*tal*, 316 F.3d at 1052. "Granting leave to amend does not necessarily mean that the underlying allegations ultimately have merit." *FlatWorld Interactives LLC v. Apple Inc.*, 12–CV–01956–WHO, 2013 WL 6406437, at *3 (N.D. Cal. Dec. 6, 2013). "Rather, '[a]bsent prejudice, or a strong showing of any of the remaining [ ] factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend.'" *Id.* (quoting *Eminence Capital*, 316 F.3d at 1052).

## III. REQUESTS FOR JUDICIAL NOTICE

The parties submitted several requests for judicial notice ("RJNs") in conjunction with these motions. Defendants filed four RJNs, which collectively request that the court take judicial notice of Exhibits A through U. *See* Defs' RJN No. 1 [Docket No. 8–2] (Ex. A through Ex. C); Defs' RJN No. 2 [Docket No. 20–6] (Ex. D through Ex. R); Defs' RJN No. 3 [Docket No. 24] (Ex. S and Ex. T); Defs' RJN No. 4 [Docket No. 36–1] (Ex. U). Plaintiff filed one RJN requesting that the court take judicial notice of Exhibits A through D. *See* Pltf's RJN [Docket No. 17].

### A. Legal Principles

Federal Rule of Evidence 201 permits a court to take judicial notice of facts not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "[A] court may take judicial notice of 'matters of public record.'" *Lee v. City of Los. Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991)).

■ A court may also take judicial notice of "records and reports of administrative bodies." *Mack*, 798 F.2d at 1282. However, when courts take judicial notice of administrative records, only the existence of the documents themselves including the findings therein are judicially noticeable, and not the contents of the documents for the truth of the matters asserted. *See, e.g., Lacayo v. Donahoe*, No. 14-CV-04077-JSC, 2015 WL 993448, at *10 (N.D. Cal. Mar. 4, 2015) (taking judicial notice of documents in ruling on a motion to dismiss "only...[as to] the existence of the administrative proceedings and the agency's findings," and not "credit[ing] the truth of any fact recounted or matter asserted in the documents").

Courts cannot take judicial notice of the contents of documents for the truth of the matters asserted therein when the facts are disputed, as they are here for certain exhibits. *See, e.g., Lee*, 250 F.3d at 689–90 (district court appropriately took judicial notice of the fact of the extradition hearing, that the waiver of extradition was signed, and that the defendant purportedly waived his right to challenge his extradition, but erred by taking judicial notice of the disputed fact of the validity of the waiver); *see also Daghlian v. DeVry Univ., Inc.*, 461 F.Supp.2d 1121, 1146–47 (C.D. Cal. 2006) (taking judicial notice of the existence of administrative reports including their contents, but not "for their truth" due to a disputed issue of fact); *Ctr. for Envtl. Health v. Vilsack*, No. 15-CV-01690-JSC, 2015 WL 5698757, at *5 (N.D. Cal. Sep. 29, 2015) (taking judicial notice of the existence of USDA's Program Handbook in ruling on a motion to dismiss, but declining to take "judicial notice of the substance of the Program Handbook for the truth of any matter asserted within the Program Handbook, including the disclaimer as to the legal effect of the 'guidance' contained therein").

**B. Defendants' RJNs**

■ Applying these principles, the court grants Defendants' request for judicial notice as to Exhibit A, O, P, and U because they are matters of public record, and contain facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Exhibits A and O are selected portions of California's General Permit for Storm Water Discharges Associated with Industrial Activity, Order No. 2014–0057–DWQ, NPDES No. CAS000001 ("General Permit"). Exhibit P is a selected portion of the Federal Register from November 16, 1990, Vol. 55, No. 222, pp. 48006–7. Exhibit U is the North Coast Regional Water Quality Control Board ("NCRWB") Order No. RI–2007–0006 entitled "Waste Discharge Requirements for In–Situ Treatment of Contaminated Soil for Ecodyne Corporation" ("NCRWB Waste Discharge Order").

■ The court grants Defendants' request as to Exhibits C, M, and S but only as to the existence of the documents, the dates they were submitted, and the existence of the contents therein. The court declines to take judicial notice of the contents for the truth of the matters asserted, because those facts are disputed. Exhibits C, M, and S are letters from a public agency. *See* http://www.waterboards.ca.gov/northcoast/ (last accessed on July 24, 2017). Exhibit C is the November 30, 2016 Letter from Paul Keiran of the NCRWB regarding Defendants' November 7, 2016 NOT ("November 30, 2016 NCRWB Letter"). Exhibit M is the January 5, 2017 Letter from Mona Dougherty of the NCRWB regarding Defendants' NOT ("January 5, 2017 NCRWB Letter"). Exhibit S is the January 30, 2017 Letter from

the NCRWB regarding Defendants' NOT ("January 30, 2017 NCRWB Letter").

Similarly, the court grants Defendants' request as to Exhibits B and L, Exhibits D through K, Exhibit N and Exhibit T, but only as to the existence of the documents, their dates, and the existence of the contents therein, and not for the truth of the matters asserted in the contents. Exhibit B is the November 7, 2016 NOT submitted by Defendants to the SWRCB ("November 7, 2016 NOT"). Exhibit L is Defendants' updated NOT to the SWRCB dated January 4, 2017 ("January 4, 2017 NOT"). Exhibits D through K are e-mails to and from Defendants' counsel, Defendant Nelson, Defendants' consultant, and various members of the NCRWB and counsel for the SWRCB dated December 22, 2016 through January 4, 2017 regarding updating Defendants' November 7, 2016 NOT. Exhibit N is a January 5, 2017 e-mail from Mona Dougherty of the NCRWB to Counsel for Plaintiff and Defendants enclosing the January 5, 2017 NCRWB Letter. Exhibit T is an e-mail from Senior Staff Counsel for the SWRCB to Counsel for Defendants and Plaintiff enclosing the January 30, 2017 NCRWB Letter.

The court does not rely on Exhibits Q and R in considering the motions, and therefore denies Defendants' requests regarding these two exhibits as moot. Exhibit Q is a complaint filed by Plaintiff on July 12, 2016 in *California Sportfishing Protection Alliance v. Forever Resorts, LLC et al.*, Case No. 2:16-cv-01595-MCE-EFB (E.D. Cal.). Exhibit R is a complaint filed by Plaintiff on February 16, 2015 in *California Sportfishing Protection Alliance v. City of Santa Cruz et al.*, Case No. 5:15-cv-00714-NC (N.D. Cal.).

In sum, the court grants Defendants' request for judicial notice for Exhibits A, O, P, and U. The court grants Defendants' request for judicial notice for Exhibits B through N, S, and T, but only as to the existence of the documents, the dates they were submitted, and the existence of their contents, and not for the truth of the matters asserted in their contents. The court denies Defendants' request for judicial notice for Exhibits Q and R.

### C. Plaintiff's RJN

Plaintiff requests that the court take judicial notice of Exhibits A through D. Exhibit A is the Notice of Intent ("NOI") to be covered under the General Permit submitted by Defendants to the SWRCB on June 30, 2015. Exhibit B is the SWRCB's receipt of Defendants' June 30, 2015 NOI. Exhibit C contains selected portions of TSG's SWPPP. Exhibit D is a January 3, 2017 print-out from the NCRWB's website which shows TSG's permit status as "active" as of December 30, 2016.

The court takes judicial notice of Exhibits A, B, and C because they are matters of public record, and contain facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. The court takes judicial notice of Exhibit D, but only as to the existence of the document, the date of the document, and the existence of the contents therein because the facts contained in the document are disputed.

### IV. DISCUSSION

Defendants move to dismiss Plaintiff's complaint due to mootness and the failure to state a claim. Since mootness is jurisdictional, the court will consider this argument first. *See United States v. Strong*, 489 F.3d 1055, 1059 (9th Cir. 2007) ("Mootness is a jurisdictional issue which we address at the threshold.").

## A. The Clean Water Act

██ As previously noted, the CWA is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and prohibits the "discharge of any pollutant" into navigable waters from any "point source" without a permit. *See* 33 U.S.C. §§ 1251(a), 1311(a); *see also* 33 U.S.C. § 1362(11) ("discharge of pollutants means...any addition of any pollutant to navigable waters from any point source...") (quotations omitted); *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 537 F.3d 1006, 1010 (9th Cir. 2008) (" '[T]he CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit.' ") (quoting *N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155, 1160 (9th Cir. 2003)). Section 402 of the CWA provides for the issuance of permits under the NPDES. 33 U.S.C § 1342(a). "The NPDES permitting program is the 'centerpiece' of the Clean Water Act and the primary method for enforcing the effluent and water-quality standards established by the EPA and state governments." *Nat. Res. Def. Council*, 673 F.3d at 891 (citation omitted). The EPA or state agencies authorized by the EPA can issue NPDES permits. 33 U.S.C. § 1342(a)-(b). In California, the SWRCB administers the NPDES program and has issued a statewide General Permit, as well as individual NPDES permits. *See* Cal. Water Code § 13267(b)(1).

██ As explained by the Ninth Circuit, "[s]torm water presents a unique problem under the CWA because it is a significant source of water pollution but is not inherently a nonpoint or point source." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 505 (9th Cir. 2013) (citation and quotation omitted). The CWA regulates storm water if the discharge falls into one of five categories, the second of which is at issue here:

(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.

(B) *A discharge associated with industrial activity.*

(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

33 U.S.C. § 1342 (p)(2)(A) through (E) (emphasis added).

Relevant to this action, "[d]ischargers of storm water associated with industrial activity" must apply for an individual permit or seek coverage under a promulgated storm water general permit. 40 C.F.R. § 122.26(c)(1); *see also* 33 U.S.C. § 1342(p)(3)(A). 40 C.F.R. § 122.26(b)(14) defines "[s]torm water discharge associated with industrial activity [as] the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." Industries covered by the term "industrial activity" are defined in accordance with SIC codes, which are used to identify regulated industrial activities. *See* 40 C.F.R. § 122.26(b)(14); *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 966 F.2d

1292, 1304–05 (9th Cir. 1992) (explaining that "EPA bases its regulation of industrial activity on Standard Industrial Classification ('SIC') categories"); *see also Ecological Rights Found.*, 713 F.3d at 512.

 Section 505(a) permits a private citizen to bring a lawsuit against any person "alleged to be in violation" of the CWA. *See* 33 U.S.C. § 1365(a)(1). Before a suit can be commenced, the citizen must give a 60-day notice of intent to sue. *See* 33 U.S.C. § 1365(b)(1)(A). The purposes of the notice are to give government agencies an opportunity to enforce environmental regulations without the need for a citizen suit, and to give the alleged violator " 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.' " *Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (quoting *Hallstrom v. Tillamook County*, 493 U.S. 20, 29, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989)).

## B. Mootness

 A plaintiff may only bring a citizen suit for future or ongoing violations of the CWA. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64, 66, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). A citizen suit is moot if it is based on wholly past violations, and if there is no reasonable expectation that the alleged wrong will be repeated. *Id.* at 66–67, 108 S.Ct. 376. Defendants argue that they were not subject to the General Permit on November 8, 2016, the day that Plaintiff filed this citizen suit, and there is no reasonable expectation that they will violate the General Permit in the future. Therefore, according to Defendants, Plaintiff's entire action is moot because it is based solely on past violations of the CWA. To support their contention that they were not covered by the General Permit as of November 8, 2016, Defendants submit a November 30, 2016 letter from the NCRWB approving Defendants' November 7, 2016 Notice of Termination. *See* November 7, 2016 NOT; November 30, 2016 NCRWB Letter (approving November 7, 2016 NOT); January 30, 2017 NCRWB Letter (stating that the effective date of Defendants' NOT is November 7, 2016).

Plaintiff does not directly address Defendants' mootness argument. Instead, Plaintiff argues that this lawsuit is not moot because the complaint also alleges that Defendants violated the CWA by discharging pollutants without a required permit. Plaintiff further responds that regardless of whether the NCRWB approved Defendants' NOT and terminated Defendants' coverage under the General Permit, this court has the independent authority to decide whether Defendants must have a permit in order to discharge pollutants under the CWA. Finally, Plaintiff argues that even if its claims regarding Defendants' violations of the General Permit are moot, its request for civil penalties is not moot because Defendants are still subject to civil penalties even if they are no longer covered by the General Permit.

### 1. Legal Principles

Under Article III of the Constitution, federal court jurisdiction only exists over cases and controversies. U.S. Const., art. III, § 2. The U.S. Supreme Court has interpreted the "case or controversy" requirement "to demand that an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed." *Campbell–Ewald Co. v. Gomez*, —— U.S. ——, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016), as revised (Feb. 9, 2016) (citation and internal quotation marks omitted); *see also Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609, 133 S.Ct. 1326, 185 L.Ed.2d 447 (2013) (same).

"As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell–Ewald Co.*, 136 S.Ct. at 669 (citation and internal quotation marks omitted). A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Decker*, 133 S.Ct. at 1335; *see also Ctr. For Biological Diversity*, 566 F.3d at 804 ("A claim is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. The basic question is whether there exists a present controversy as to which effective relief can be granted.") (citation and internal quotation marks omitted). In seeking to dismiss a case as moot, "a defendant's burden is a heavy one." *Gwaltney*, 484 U.S. at 66, 108 S.Ct. 376 (internal quotation marks omitted).

As explained in *Gwaltney*, Section 505 of the CWA provides for the filing of a citizen suit "against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit." 484 U.S. at 53, 108 S.Ct. 376 (quoting 33 U.S.C. § 1365(a)(1)). In construing the statutory language of the CWA's citizen suit provisions, the Supreme Court held that the "interest of the citizen-plaintiff is primarily forward looking." 484 U.S. at 59, 108 S.Ct. 376. The Court ultimately determined that wholly past violations are not actionable through citizen suits under the CWA. *Id.* at 58–64, 108 S.Ct. 376. However, if a defendant ceases its noncompliant behavior once a citizen suit commences, the suit is not automatically moot. *Id.* at 66, 108 S.Ct. 376. Consistent with traditional mootness principles, a defendant must satisfy a "heavy burden" of showing that "it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be ex-

pected to recur." *Id.* at 66, 108 S.Ct. 376 (citation and internal quotations marks omitted) (emphasis in original)). The "mootness doctrine thus protects defendants from the maintenance of suit under the [CWA] based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform." *Id.* at 66–67, 108 S.Ct. 376 (internal quotations omitted).

### 2. Analysis

Applying these principles, the court finds that Defendants have not met their "heavy burden" to establish that Plaintiff's citizen suit is moot at this early stage of the case. Defendants' mootness argument hinges entirely on the November 7, 2016 NOT, which, according to Defendants, terminated Defendants' coverage under the General Permit one day before the lawsuit was filed, thereby instantly mooting all of Plaintiff's claims regarding noncompliance with the General Permit.

As set forth above, the court does not take judicial notice of the truth of the content of documents submitted by Defendants in support of their mootness argument, because the parties hotly contest certain facts in those documents. *See* November 7, 2016 NOT; November 30, 2016 NCRWB Letter; January 30, 2017 NCRWB Letter. Specifically relevant here, Plaintiff disputes the validity of the November 7, 2016 NOT. *See* Opp'n to MTD at 18, n.5; Pltf's RJN at 2–3; FAC ¶ 70 (alleging that the November 7, 2016 NOT "was invalid and therefore ineffective in terminating coverage"). At the hearing, Plaintiff also asserted that if the NOT is valid, the effective date of termination is January 5, 2017,[1] not November 7, 2016.

---

1. On January 5, 2017, Mona Dougherty of the NCRWB sent a letter to Nelson stating that

According to Plaintiff, if the effective date of termination of Defendants' NOT is January 5, 2017, the case is not moot because Defendants were still violating the requirements of the General Permit at the time this citizen suit was filed and for months afterwards.

Given the existence of key disputed facts at this early stage in the case, the court concludes that Defendants have not met their heavy burden of showing that Plaintiff's claims for violations of the General Permit are moot because they are based wholly on past violations of the CWA. The court therefore need not address Plaintiff's additional arguments regarding the court's independent authority to determine whether Defendants needed a permit for its storm water discharges, and the non-mootness of the claim for civil penalties.

## C. Failure to State a Claim

■ Defendants argue that even if the case is not moot, it nevertheless must be dismissed because it fails to state a legally cognizable claim. In essence, Defendants argue as a matter of law that they cannot be held responsible for storm water discharges under the CWA because they are passive landowners who are not involved in the industrial activities of their tenants. *See, e.g.,* MTD at 7:18–25; Reply at 8:4–6.

This argument is wide of the mark, for Plaintiff does not allege that Defendants

are "passive landlords." Instead, the FAC alleges that Defendants "own and operate," "maintain and control" the Facility. FAC ¶ 10. According to the FAC, Defendants maintain and control the Facility's common infrastructure, "including the storm water infrastructure that collects and combines storm water from various parts of the Facility and transports it by point source conveyances including ditches and pipes, and discharges it directly into Pruitt Creek." *Id.* ¶¶ 10, 55, 56, 106. As owners and operators "of the entire industrial park," Defendants thereby "control the storm water flows from the Facility." *Id.* ¶ 60. The FAC further alleges that Defendants have "knowingly chosen to allow industrial activities to operate in outdoor areas throughout the Facility." *Id.* ¶ 52.[2]

As the case is still in the pleading stage, the court must accept Plaintiff's allegations as true. *Erickson,* 551 U.S. at 94, 127 S.Ct. 2197 (when reviewing a motion to dismiss for failure to state a claim, court must "accept as true all of the factual allegations contained in the complaint"); *Shroyer,* 622 F.3d at 1041 (court may dismiss case "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory."). Therefore, the proper inquiry at this juncture is whether Defendants can be liable under the CWA for storm water discharg-

the NCRWB approved Defendants' November 2016 NOT and that Defendants' coverage under the General Permit was terminated as of January 5, 2017. *See* January 5, 2017 NCRWB Letter. As discussed above, the court did not take judicial notice of the matters asserted in this letter because the facts are disputed. *See supra* at —— for discussion regarding Defs' RJN, Ex. M.

**2.** Although more fleshed out in the FAC, the complaint makes similar allegations. The complaint alleges that Defendants "own[ ] and/or operate[ ]" the Facility and discharge

polluted storm water associated with the industrial activities that occur within the Facility. Compl. ¶¶ 5, 47, 50–51. Most of the industrial activities occur outside in areas which are "exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls." *Id.* ¶ 48. When it rains, storm water flows over materials associated with industrial activities, and becomes contaminated before leaving the Facility; the polluted storm water then drains into navigable waters via storm water conveyances. *Id.* ¶¶ 49–50.

es associated with industrial activities, when Defendants themselves do not engage in industrial activities but instead own, operate, maintain, and control the Facility which is leased to tenants who engage in such activities.[3]

The analysis begins with the statutory language. The CWA prohibits the " 'discharge of any pollutant by any person' unless done in compliance with some provision of the Act," such as pursuant to and within the limits of an NPDES permit. *Nat. Res. Def. Council*, 673 F.3d at 885 (quoting 33 U.S.C. § 1311(a)). " 'Discharge of a pollutant' is defined as 'any addition of any pollutant to navigable waters from any point source[.]' "[4] *Id.* (quoting 33 U.S.C. § 1362(12).

The Ninth Circuit has interpreted this language broadly to prohibit discharges by those who merely convey pollutants, and who do not generate pollutants or add them to storm water. In *Natural Resources Defense Council*, the court explained that the CWA " 'bans 'the discharge of any pollutant by any person' regardless of whether that 'person' was the root cause or merely the current superintendent of the discharge.' " 673 F.3d at 900 (quoting *W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 167 (4th Cir. 2010) (emphasis omitted)). The plaintiffs in *Natural Resources Defense Council* alleged that two municipal entities, Los Angeles County ("County") and Los Angeles County Flood Control District ("District"), violated the CWA by discharging polluted urban storm water into navigable waters through municipal separate storm sewers ("MS4s"). 673 F.3d at 883. The District operated an extensive flood control and storm water MS4 infrastructure which collected storm water runoff from thousands of storm drains located in municipalities throughout the county, and channeled it into watershed rivers that drain into the Pacific Ocean. *Id.* at 884. The District argued that it was not liable under the CWA for discharging pollutants in exceedance of its NPDES permit because, although it conveyed polluted storm water via the MS4 infrastructure, the infrastructure itself did not generate or discharge pollutants. *Id.* at 889. The district court granted summary judgment in favor of the District on all claims. *Id.*

The Ninth Circuit Court of Appeals reversed summary judgment on two claims against the District for discharging pollutants in excess of its NPDES permit in the Los Angeles River and the San Gabriel River. *Id.* at 890, 900–02. In so doing, the court rejected the District's arguments that the plaintiff lacked evidence connecting the District to the water quality exceedances, and that "merely channeling pollutants created by other municipalities or industrial NPDES permittees should not create liability" under the CWA because the District did not "add" or "generate" the pollutants. *Id.* at 892, 900. The Ninth Circuit held, in no uncertain terms, that

---

**3.** It appears to be undisputed that the Facility's tenants engage in industrial activities that are subject to the CWA's permitting requirements for storm water discharges. *See, e.g.,* Reply to MTD at 1–3, 11–12; Opp'n to MTA at 2, 12.

**4.** A point source is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding opera-

tion, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural storm water discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362(14). Here, Plaintiff alleges that the Facility's storm water infrastructure collects and transports storm water "by point source conveyances including ditches and pipes, and discharges it directly into Pruitt Creek." FAC at ¶ 10.

"the Clean Water Act does not distinguish between those who add and those who convey what is added by others—the Act is indifferent to the originator of water pollution." *Id.* at 900. The court noted that "Defendants ignore their role as *controllers* of thousands of miles of MS4 and the stormwater it conveys by demanding that Plaintiffs engage in the Sisyphean task of testing particular storm drains in the County for the source of each pollutant." *Id.* at 899 (emphasis added).

The Tenth Circuit reached a similarly broad interpretation of the CWA, holding that the focus of section 1311(a) is on the fact of the discharge, rather than the underlying conduct leading to the discharge. *See Sierra Club v. El Paso Gold Mines,* 421 F.3d 1133 (10th Cir. 2005). The court thus held that the prohibitions of the CWA apply to persons who unlawfully discharge pollutants from a point source, even if they do not affirmatively engage in activities that "add" pollutants to the discharge. *Id.* at 1145. In *Sierra Club,* the defendant owned 100 acres of land west of Colorado Springs that included an inactive gold mine and a partially collapsed mine shaft. The defendant was a successor landowner that had never conducted any mining operations on the property. *Id.* at 1136. The mine shaft connected the mine to the Roosevelt Tunnel, which discharged water into Cripple Creek, and eventually emptied into the Arkansas River. *Id.* The plaintiff filed a citizen suit against the defendant landowner for unlawfully discharging pollutants from a point source, i.e., the mine shaft, into Cripple Creek without a permit. *Id.* According to evidence submitted by the plaintiff, the pollutants from the dormant mine continually flowed through the rock and mine workings until they reached the shaft, which discharged the pollutants into the tunnel. *Id.* at 1141. The defendant argued it could not be liable under the CWA simply by virtue of being the successor landlord. *Id.* at 1137, 1143–44. The Tenth Circuit Court of Appeals disagreed. It explained that when viewing the CWA as a whole, "it is apparent the liability and permitting sections of the [CWA] focus on the point of discharge, not the underlying conduct that led to the discharge." *Id.* at 1143. The court held that "the Act's language does not exempt successor landowners from liability under Sections 301(a) and 402 for point source discharges occurring on their land." *Id.* at 1144. Indeed, "[t]he introduction of 'point source' into the statutory scheme to define 'discharge' and give context to 'addition' can only mean that we look to whether the point source is actively adding pollutants to navigable waters. *And if the point source is 'discharging,' the 'person' who owns or operates the point source is liable under the Act.*" *Id.* at 1145 (emphasis added). The Tenth Circuit concluded "[t]his is a case where if you own the leaky 'faucet,' you are responsible for its 'drips.'" *Id.*; *see also Rapanos v. United States,* 547 U.S. 715, 743, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (citing *Sierra Club* in dicta for the proposition that "discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates § 1131(a), even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between." (emphasis in original)).

Two district courts within the Ninth Circuit held that a party may be liable under the CWA for unlawful storm water discharges associated with industrial activities if the party exercises sufficient control over a facility that discharges unlawful pollutants, even if the party did not create the discharges. *See Puget Soundkeeper All. v. Cruise Terminals of Am., LLC,* No. C14-0476 JCC, 2014 WL 4649952, at *4 (W.D. Wash. Sep. 16, 2014) ("*Puget Soundkeeper I*"); *Puget Soundkeeper All. v.*

*Cruise Terminals of Am., LLC*, 216 F.Supp.3d 1198, 1223–25 (W.D. Wash. 2015) ("*Puget Soundkeeper II*"); *Resurrection Bay Conservation All. v. City of Seward*, No. 3:06-cv-0224-RRB, 2008 WL 508499, at *4-6, 2008 U.S. Dist. LEXIS 13667, at *12–18 (D. Alaska Feb. 21, 2008).

In *Puget Soundkeeper Alliance*, the plaintiff alleged that the defendants Cruise Terminals of America and the Port of Seattle violated the CWA by discharging industrial storm water runoff and other pollutants into navigable waters without a permit. *Puget Soundkeeper II*, 216 F.Supp.3d at 1204–06. In moving for summary judgment, the defendants argued that they "did not directly cause any of the alleged unpermitted discharges and therefore should not be liable." *Id.* at 1223. The district court rejected the argument, explaining that the CWA "imposes liability both on the party who actually performed the work and on the party with responsibility for or control over performance of the work." *Id.* Thus, as explained by the district court, neither of the defendants "need[ed] to have actually caused any discharges at the cruise terminal; they may both be liable so long as each possesse[d] sufficient control over the facility and knowledge of the alleged violations." *Id.*

Similarly, in *Resurrection Bay*, the plaintiffs contended at summary judgment that the City of Seward violated the CWA by discharging polluted storm water associated with industrial activities into navigable waters without a permit. 2008 WL 508499, at *1, 2008 U.S. Dist. LEXIS 13667, at *1-2. The court first "carefully reviewed the SIC codes and the documented activities," and concluded that the Small Boat Harbor and the Boat Repair Area at issue were industrial facilities. *Id.* at *4, 2008 U.S. Dist. LEXIS 13667, at *12. Similar to the case at hand, the City of Seward argued that its own activities were not industrial, and that it therefore could not be held liable for the discharges. *Id.* at *4, 2008 U.S. Dist. LEXIS 13667, at *12. The court held that the City of Seward was liable under the CWA because it "retain[ed] sufficient involvement in, and control of" both facilities. *Id.* at *5, 2008 U.S. Dist. LEXIS 13667, at *16. Specifically, the plaintiffs presented evidence that the City's activities at the facilities included snow removal, maintaining ditches and culverts to facilitate the flow of storm water, cleanup and disposal of residual water, and hauling boats to and from the facilities. *Id.* Moreover, the court found that the City was "the only entity that possesses control over the facilities." *Id.* at *5, 2008 U.S. Dist. LEXIS 13667, at *16-17. The court found that "for purposes of the CWA, the City is an operator of industrial facilities which discharge storm water into waters of the United States." *Id.* at *6, 2008 U.S. Dist. LEXIS 13667, at *18.

In summary, the Ninth Circuit and Tenth Circuit have held that a party can be held liable for illegal discharges under the CWA if it conveyed the discharge (or, in the case of the Tenth Circuit, owned the point source through which the pollutant was discharged), even if the party did not generate or add the pollutant to the discharge. At least two district courts within the Ninth Circuit have held that an owner and/or operator that exercises sufficient control over a facility can be liable under the CWA for storm water discharges associated with industrial activities, even if the defendant does not itself engage in industrial activities. At the hearing, Defendants conceded that they could not identify any case that stands for the legal proposition they assert, i.e., that a private landlord cannot be liable under the CWA for pollution created by its tenants. The case law therefore strongly supports Plaintiff's position.

In response, Defendants attempt to distinguish the cases. Defendants' primary argument is that none of the cases address the liability of a landlord who does not engage in an industrial activity. Reply at 6, n.3. As previously explained, this inaccurately frames the issue now before the court, for Plaintiff does not allege that Defendants are merely landlords; Plaintiff alleges that Defendants own, operate, and control the Facility.

As to *Natural Resources Defense Council*, Defendants assert that it is inapposite because it involves permit-exceedance claims for storm water discharge through an MS4, rather than storm water discharge associated with industrial activities. *Id.* This is a distinction without a difference, for the Ninth Circuit's key ruling that the CWA "does not distinguish between those who add and those who convey what is added by others" does not hinge on the fact that the discharge occurred through an MS4 channel, rather than through another type of point source such as a pipe or ditch, as defined by 33 U.S.C. § 1362(14). *Nat. Res. Def. Council*, 673 F.3d at 900.[5] Similarly, Defendants attempt to distinguish *Sierra Club* by stating that it involved an abandoned mine and did not involve storm water, and that the case did not address the responsibility between an owner and an operator, or what constitutes an industrial activity. Reply at 7. These distinctions also are not meaningful, for the Tenth Circuit's key ruling that "point source owners...can be liable for the discharge of pollutants occurring on their land, whether or not they acted in some way to cause the discharge" does not turn on the assorted facts identified by Defendants. *Sierra Club*, 421 F.3d at 1145.

Defendants acknowledge that both *Puget Soundkeeper* and *Resurrection Bay* involve liability for discharges of storm water associated with industrial activities, but attempt several distinctions. As to *Puget Soundkeeper*, Defendants claim that the case is not persuasive because the defendants were already subject to a permit based on their own industrial activities, citing to 216 F.Supp.3d at 1211–12. Reply at 7. Review of this citation reveals that the premise that the defendants already had a permit is factually inaccurate. The citation makes clear that the plaintiff in *Puget Soundkeeper* argued that the defendants *should* be subject to a permit, but had not obtained one. Even if the distinction were factually accurate, it is hard to understand why it would make a difference, as the CWA prohibits discharges made without a permit, or made in exceedance of a permit. *See, e.g., S. Cal. All. of Publicly Owned Treatment Works v. U.S. Envtl. Prot. Agency*, 853 F.3d 1076, 1078 (9th Cir. 2017) (the "CWA prohibits the discharge of any pollutant into navigable waters from any point source without a permit"); *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) ("[A] permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates the permit's terms."). As to *Resurrection Bay*, Defendants argue that the case is inapposite because the facility had an SIC code that was subject to the permit. Reply at 7. This is not a persuasive distinction. In fact, the *Resurrection Bay* case is parallel to the current case in this regard, for it is undisputed that the activities performed at the Facility by Defen-

---

**5.** Defendants also try to distinguish *Natural Resources Defense Council* by stating that "the defendant was the owner and operator." Once again, this inaccurately frames the cur-

rent dispute, for Plaintiff alleges here that Defendants own, operate and control the Facility.

dants' tenants all fall within SIC codes recognized as industrial activities. *See su-pra* at n.2.

Finally, Defendants assert that the facts of *Puget Soundkeeper Alliance* and *Resurrection Bay* illustrate that the defendants in those cases had far more involvement in their tenants' industrial activities than Defendants do here. It is premature to address these questions of fact at the pleading stage. In sum, Defendants' attempted distinctions do not detract from the basic holding of each case: that owners and/or operators who have sufficient control over a facility can be held liable under the CWA even if they do not themselves perform the industrial activities that create the pollutants in the storm water discharge.

Defendants also assert that a regulation supports the position that owners are treated differently from operators, and therefore the tenants are legally responsible for storm water discharges associated with the industrial activities at the Facility, and not Defendants. *See* MTD at 6–7; Reply to MTD at 6–8. 40 C.F.R. § 122.21(b) states that "[w]hen a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit." Once again, Defendants misframe the legal inquiry. Plaintiffs allege that Defendants are both owners *and* operators, and thereby are required to obtain a permit. Therefore, any distinction between owner and operator permit requirements that one might glean from this regulation would not make a difference here. Moreover, as noted by the court in *Puget Soundkeeper Alliance*, this particular regulation addresses who must apply for a permit, which is "a separate question

from whether [an entity] is unlawfully discharging pollutants in the first place." *Puget Soundkeeper I*, 2014 WL 4649952, at *2, n.4.

Defendants also argue that they cannot be liable under the CWA for storm water discharges at the Facility because their activities as landlords do not fall within a SIC code. Here, Defendants rely on 40 C.F.R. § 122.26(b)(14), which identifies the industrial activities for which a permit is required if there are discharges of storm water associated with those industrial activities. *See* MTD at 8; Reply to MTD at 5–6. Defendants do not cite any authority for their novel argument that the list of industrial activities in 40 C.F.R. § 122.26(b)(14) somehow precludes liability under the CWA for a landlord who operates or controls a facility that discharges polluted storm water associated with industrial activities identified in this regulation. Defendants do not and cannot square this argument with the case law discussed above interpreting the obligation of owners, operators and those who control facilities under the CWA.

Lastly, Defendants argue that an excerpt from the Federal Register supports their position that mere ownership of a storm water conveyance that discharges storm water associated with industrial activities does not create liability under the CWA. *See* National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47990–01, 48006–07 (Nov. 16, 1990) (Ex. P). Defendants' briefing makes two passing references to the Federal Register excerpt; their arguments in both instances are terse and opaque.[6]

---

6. The first reference occurs in a sentence in a footnote in their Reply to the motion to dismiss, in which Defendants state that the "EPA stated that this regulation [namely 40 C.F.R. § 122.26(a)(6)(i)] was not intended to require

owners of private conveyances to obtain permits." *See* Reply to MTD at 7, n.3. First of all, Defendants once again argue from a false factual premise, i.e., that they are alleged to be merely owners. Moreover, the EPA did not

In contrast to the minor nod in their briefing, Defendants made a more extensive argument regarding the Federal Register excerpt at the hearing. According to Defendants, the discussion of 40 C.F.R. § 122.26(a)(6)(i) in the Federal Register indicates that the EPA specifically considered the issue presented in this case, namely, whether a mere owner of a private storm water conveyance can be liable under the CWA for discharges associated with industrial activity generated by others. According to Defendants, the EPA rejected the inclusion of language in the regulation that would require "either" the owner of the private storm water conveyance "or" the operator of the industrial activity associated with storm water discharge to get a permit; i.e., the "either/or" approach. See 55 Fed. Reg. at 48006. Instead, 40 C.F.R. § 122.26(a)(6)(i) requires "all operators of storm water discharges associated with industrial activity that discharge" into a non-municipal storm water conveyance to be covered by a permit, thereby eliminating the need for the owner of a storm water conveyance, who does not itself engage in industrial activity, to get a permit. See 55 Fed. Reg. at 48006. While not entirely clear, Defendants appear to

contend that the EPA rejected the "either/or" approach because it knew that owners of private storm water conveyances would not likely have control over industrial tenants. For this reason, they argue that the EPA drafted the regulation to require the actual operator of the industrial activity (the entity with the SIC code for the industrial activity) to get a permit for storm water discharges associated with industrial activity.

Defendants' argument is unpersuasive. As discussed herein, it rests again on a faulty factual premise, i.e., that Plaintiff alleges that Defendants are passive owners of private storm water conveyances. According to Plaintiff, Defendants are owners and operators who maintain and control the Facility's common infrastructure including its ditches and pipes, and thereby control polluted storm water discharges associated with industrial activities. See FAC ¶¶ 6, 10, 55–56, 106. The Federal Register excerpt does not shed light on whether owners and/or operators who have sufficient control over a facility can be held liable under the CWA even if they do not perform the industrial activities that create the pollutants in the storm water discharge.[7]

make the precise statement attributed to it by Defendants. Rather, "two commenters" expressed concern that "private owners of conveyances may not have the legal authority to implement controls on [all] discharges through their system and would not want to be held responsible for such controls." 55 Fed. Reg. at 48006. EPA's somewhat unclear response was that the regulation would only require permit coverage for "each storm water discharge associated with industrial activity." *Id.*

The second reference to the Federal Register occurs in one sentence in Defendants' opposition to the motion to amend. Defendants argue that Plaintiff's theory that "the operation of a conveyance somehow makes [Defendants] subject to either the General Permit or an individual NPDES permit" is "directly contrary" to EPA's position, as stat-

ed in the Federal Register, that "non-municipal operators of storm water conveyances, which receive storm water runoff from industrial facilities, but are not generating storm water discharges associated with industrial activity themselves, [are] not required to obtain a permit." *See* Opp'n to MTA at 10. Defendants do not explain their point further. Moreover, they do not attempt to reconcile their position with the Ninth Circuit's ruling in *Natural Resources Defense Council* that the CWA "does not distinguish between those who add and those who convey what is added by others." 673 F.3d at 900.

7. For its part, Plaintiff relies on 40 C.F.R. § 122.26(a)(6)(i) to support its view that "the party who owns the 'portion of the system that discharges into waters of the United States" must have a permit for storm water

In conclusion, the court finds that under the law of this Circuit, Plaintiff may pursue a theory that Defendants, as owners and operators who maintain and control the Facility, may be liable under the CWA for storm water discharges associated with their tenants' industrial activities, even if Defendants themselves do not perform the industrial activities that create the pollutants in the storm water discharge.

## D. Motion to Amend

In its Motion to Amend, Plaintiff seeks leave to file the FAC. The proposed FAC re-alleges all four claims in the original complaint, and includes additional allegations describing Defendants' control of the Facility. For the reasons discussed above, the court grants leave to file the FAC because it alleges a viable theory that Defendants are liable under the CWA because they own, operate, and control the entire Facility, including the storm water conveyance system, and discharge storm water associated with industrial activity through that system.

The proposed FAC also states a new fifth claim alleging, in the alternative, that Defendants are liable for violating the CWA by discharging polluted storm water associated with industrial activity without a permit. Defendants argue that the court lacks jurisdiction over the fifth claim because Plaintiff's second 60–Day Notice did not provide sufficient notice of that claim. According to Defendants, the second 60–Day Notice is insufficient because it (1) fails to identify what industrial activities caused the unlawful discharge of polluted storm water; (2) fails to identify the location of the alleged violations; (3) fails to allege whether Defendants engage in such industrial activities and discharge polluted storm water; (4) fails to allege what type of permit Defendants should have; and (5) does not allege the same violation that is alleged in the proposed fifth claim. Defendants also contend that a party cannot allege contradictory allegations in the same pleading, and thus the court should deny Plaintiff's request to amend its complaint to include the fifth claim alleging liability for discharges without a permit.

The court will discuss each argument in turn, starting with Defendants' position regarding the sufficiency of the second 60–day Notice.

### 1. Legal Principles

■■■■ Compliance with the CWA's 60–day notice provision is "a mandatory, not optional, condition precedent for suit." *Hallstrom*, 493 U.S. at 26, 110 S.Ct. 304. "When a party does not fulfill that threshold requirement, 'the district court must dismiss the action as barred by the terms of the statute.'" *Ctr. For Biological Diversity*, 566 F.3d at 800 (quoting *Hallstrom*, 493 U.S. at 33, 110 S.Ct. 304).

The notice must be provided to the alleged violator, the Administrator of the EPA, and the State where the violation occurred. *See* 33 U.S.C. § 1365(b)(1)(A)(ii).

discharges associated with industrial activities. *See* Opp'n to MTD at 11 (quoting 40 C.F.R. § 122.26(a)(6)). However, Plaintiff grafts the concept of ownership on to the regulation, which does not so state. The plain language of 40 C.F.R. § 122.26(a)(6) addresses operators, not owners. Additionally, to the extent Plaintiff argues that the regulation requires Defendants to obtain a permit because they are operators, the regulation actually provides that all storm water discharge associated with industrial activity that discharges through a non-municipal storm sewer system must be covered by either "an individual permit" or "a permit issued to the operator of the portion of the system that discharges to waters of the United States, with each discharger to the non-municipal conveyance a co-permittee to that permit." 40 C.F.R. § 122.26(a)(6)(i). Plaintiff does not explain how the "either/or" language supports its position.

Under the EPA's regulations, notice regarding an "alleged violation of an effluent standard or limitation or of an order with respect thereto" shall include "sufficient information to permit the recipient to [1] identify the specific standard, limitation, or order alleged to have been violated, [2] the activity alleged to constitute a violation, [3] the person or persons responsible for the alleged violation, [4] the location of the alleged violation, [5] the date or dates of such violation, and [6] the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a).

As explained by the Ninth Circuit, "[t]he key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance." *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 916 (9th Cir. 2004) (citation and internal quotation marks omitted). "Notice is sufficient if it is reasonably specific and if it gives 'the accused company the opportunity to correct the problem.'" *Id.* at 917 (quoting *S.F. BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002), *cert. dismissed*, 539 U.S. 924, 123 S.Ct. 2296, 156 L.Ed.2d 147 (2003)). "Although the Act's notice requirement is strictly construed, plaintiffs are not required to list every specific aspect or detail of every alleged violation." *Waterkeepers N. Cal.*, 375 F.3d at 917 (internal quotation marks omitted). "The point of the Act's notice requirement is not to prove violations, it is to inform the polluter about what it is doing wrong, and to allow it an opportunity to correct the problem." *Id.* at 920 (internal quotation marks and emphasis omitted).

### 2. Analysis

As with Plaintiff's first 60–Day Notice, the second 60–Day Notice is addressed to TSG and Nelson, who Plaintiff identifies as a Managing Member of TSG. *See* Second 60–Day Notice. Plaintiff appears to make the same allegations as to Nelson and TSG, who are referred to collectively as "TSG." According to Plaintiff, TSG are "the responsible owners, officers and/or operators of the Facility." *Id.* at 1. The Facility unlawfully discharges polluted storm water associated with industrial activity "through numerous discharge[ ] points connected to a system of underground storm water conveyances throughout the 31–acre Facility and into Pruitt Creek, which joins Pool Creek and Windsor Creek, which drain into Mark West Creek, which drains into the Russian River," without a required permit. *Id.* at 2. Each unlawful discharge on each separate day is a separate violation of the CWA. *Id.* at 2. These violations have occurred since December 1, 2016 "including but not limited to December 7, 8 and 9, 2016." *Id.* at 3.

Applying the aforementioned principles, the court finds that Plaintiff's second 60–Day Notice is sufficient to meet the requirements of 40 C.F.R. § 135.3(a). The notice identifies the specific standards Defendants are alleged to have violated (Section 301(a) of the CWA and 40 C.F.R. § 122.30(a)); the approximate dates of the violations (since December 1, 2016); the location of the alleged violation (the Facility and its underground storm water conveyance system); the persons responsible for the alleged violation (Nelson and TSG); and the person giving notice (the Executive Director of California Sportfishing Protection Alliance).

While the notice is not a model of clarity and is terse in certain respects, it sufficiently describes the alleged CWA violations. Specifically, the notice states that Defendants are "the responsible owners, officers and/or operators of the Facility." *See* Second–60 Day Notice at 1. Reasonably construing the notice, Plaintiff alleges

that TSG (Nelson and the Shiloh Group) are owners and operators of a Facility that discharges polluted storm water associated with industrial activities, and are therefore liable under the CWA for any unlawful discharges. *See Waterkeepers N. Cal.*, 375 F.3d at 920 (explaining that the purpose of a CWA notice is to "inform the polluter about what it is doing wrong, and to allow it an opportunity to correct the problem," not to "prove violations") (internal quotation marks omitted); *see also United States v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998) (holding that a person may be held liable as a "responsible corporate officer" under the CWA "if the person has authority to exercise control over the corporation's activity that is causing the discharges," and that there was no "requirement that the officer in fact exercise such authority or that the corporation expressly vest a duty in the officer to oversee the activity"); *N. Cal. River Watch v. Oakland Mar. Support Servs., Inc.*, No. C 10-03912 CW, 2011 WL 566838, at *4 (N.D. Cal. Feb. 14, 2011) (explaining that under the CWA, "penalties may be imposed against individuals who are in positions of authority at polluting companies") (citing *Iverson*).[8]

Lastly, Defendants' argument that Plaintiff cannot plead contradictory allegations in the same pleading lacks merit. Courts "have repeatedly held that two alternative and contradictory claims do not make either claim implausible under Fed. R. Civ. P. 12, even where a plaintiff claims ownership of a property in one claim that he disclaims in another." *Rouch v. NGB Markets, Inc.*, No. 5:14-CV-00012-PSG, 2014 WL 12629931, at *1 (N.D. Cal. Mar. 18, 2014); *see also PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858–59 (9th Cir. 2007) (explaining that "pleadings in the alternative—even if the alternatives are mutually exclusive" is allowed). Here, Plaintiff pleads that Defendants violated the CWA either by discharging storm water associated with industrial activity in exceedance of the limitations in the Permit, or, alternatively, without the required Permit. As discussed herein, the factual development of the record may narrow or eliminate certain theories of liability. However, at this early stage of the case, Plaintiff may maintain alternative theories of liability in its FAC. This is particularly so where there are critical factual disputes regarding whether Defendants' NOT is valid, and if so, what is the effective date of termination of Defendants' permit.

For all the reasons stated above, the court grants Plaintiff's motion to amend to file the FAC.

---

8. In their opposition to the motion to amend, Defendants also argue that the court lacks subject matter jurisdiction over Plaintiff's fifth claim because Plaintiff's second 60-day notice does not allege the same violation as the violation pleaded in the fifth claim. According to Defendants, Plaintiff's fifth claim specifically alleges that Defendants "maintain and control the Facility's infrastructure," and discharged storm water associated with industrial activity. FAC ¶ 106. Plaintiff's second 60-day notice does not contain such allegations, and only alleges that Defendants violated the CWA by discharging storm water associated with industrial activity without the required permit. *See* Second 60-Day Notice at 2. Defendants' argument is unpersuasive. As discussed above, the notice need not prove up Plaintiff's claim and does not require Plaintiff to list "every specific aspect or detail of every alleged violation." *Waterkeepers N. Cal.*, 375 F.3d at 917. Plaintiff's allegations regarding Defendants' control of the Facility support Plaintiff's overall theory of liability for Defendants, which the second 60-day notice does articulate, i.e., that Defendants are "the responsible owners, officers and/or operators of the Facility," albeit in a somewhat conclusory fashion. Moreover, the actual CWA violation alleged in the fifth claim is the same alleged violation in the notice, i.e., Defendants' unlawful discharge of storm water associated with industrial activity without a permit.

## V. CONCLUSION

The court denies Defendants' motion to dismiss. The court grants Plaintiff's motion to amend. Plaintiff shall promptly file the proposed FAC that it submitted with its motion to amend. The parties shall exchange their Rule 26 Initial Disclosures by **August 23, 2017.** The Initial Case Management Conference will be set for **August 30, 2017 at 1:30 p.m.** The parties' Joint Case Management Conference Statement is due on **August 23, 2017.**