Filed 12/12/25  The Boeing Co. v. Regional Water Quality Control Bd CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION FIVE

| | |
|---|---|
| THE BOEING COMPANY,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>REGIONAL WATER QUALITY CONTROL BOARD, LOS ANGELES REGION,<br><br>  Defendant and Respondent. | B344489<br><br>(Los Angeles County Super. Ct. No. 23STCP04550) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen I. Goorvitch, Judge.  Affirmed.

Jones Day, Thomas M. Donnelly and David J. Feder, for Plaintiff and Appellant.

Rob Bonta, Attorney General, Evan Eickmeyer, Acting Senior Assistant Attorney General, Jennifer Kalnins Temple, Supervising Deputy Attorney General, and Dylan Redor, Deputy Attorney General, for Defendant and Respondent.

\* \* \* \* \* \*

For years now, the Boeing Company (Boeing) has been engaged in environmental cleanup of the now-defunct Santa Susana Field Laboratory (the site). Effective January 1, 2024, the Regional Water Quality Control Board for the Los Angeles Region (the Regional Board) issued Boeing a stormwater discharge permit with two new requirements—namely, (1) a requirement that Boeing monitor pollutants called polychlorinated biphenyls (PCBs) in the stormwater runoff using a sensitive testing method, and (2) a requirement that Boeing limit the quantum of aluminum in stormwater runoff discharged from the site. On appeal, Boeing argues that the first requirement is invalid because the Regional Board did not first balance the burdens of the more sensitive testing method against its benefits, as mandated by Water Code section 13267, subdivision (b) (section 13267(b)),[1] and that the second requirement is unwarranted because insufficient evidence ties the aluminum levels in the stormwater runoff to the prior industrial activity at the site. Because Boeing has failed to show how the Regional Board's error in failing to apply section 13267(b) was prejudicial, and because substantial evidence supports the Regional Board's finding that the aluminum levels

---

[1] All further statutory references are to the Water Code unless otherwise indicated.

are associated with industrial activity at the site, we affirm the trial court's denial of Boeing's petition for a writ of administrative mandate.

## FACTS AND PROCEDURAL BACKGROUND

### I.     The Site

The site is a 2,850-acre property, comprised of developed and undeveloped land, located in the Simi Hills of Ventura County, California.  More than 700,000 people live within 10 miles of the site.

From the 1950s through the mid-1970s, the site was used by Boeing or its predecessors for research and development, as well as the assembly, disassembly, and testing of rocket engines and chemical lasers.  The U.S. Department of Energy also conducted research and development of energy-related programs and seismic testing at the site, using nuclear reactors until 1980; NASA operated rocket engine assembly and testing at the site until 2006.  Various pollutants were used during these operations.  Although industrial activity at the site ceased nearly two decades ago, the site today still operates for cleanup and remediation purposes to address the significant pollutants that still remain.

The site is currently owned in part by Boeing and in part by the federal government.  This case concerns Boeing's role at the site.

### II.     Stormwater Discharge Permits at the Site

Although California's Department of Toxic Substance Control is the "lead agency" for soil and groundwater clean-up at the site, this case concerns only the Regional Board's oversight.

As pertinent here, the Regional Board issues a permit— also known as waste discharge requirements (WDR)—that

3

governs the stormwater that may be discharged from the site. Every time it rains or snows, stormwater traverses the site and picks up pollutants remaining in the soil. For the majority of the stormwater that flows over the site, that stormwater is first "captured" in holding ponds, where it can be monitored and, if warranted, conveyed to a treatment system; the stormwater is then discharged through "outfalls" into nearby creeks and tributaries that flow to the Los Angeles River. As pertinent here, the permit issued by the Regional Board specifies how Boeing is to (1) monitor specified pollutants in the stormwater, and (2) treat specified pollutants so that only a maximum allowable concentration of those pollutants (in the vernacular, an "effluent limitation") is discharged into the waterways. (See *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 618-619 (*Burbank*); 33 U.S.C. § 1362(11).)

The site has the potential to discharge approximately 187 million gallons per day of stormwater runoff that may contain pollutants.

### A. *Prior permits*

The Regional Board has issued stormwater discharge permits to Boeing for the site since 1998. In the last 16 years, Boeing has expended over $100 million to improve stormwater quality at the site.

### B. *The current permit issued in 2024*

In 2019, Boeing applied to renew its stormwater discharge permit.

After circulating several drafts, analyzing over 20,000 data points, and convening multiple highly attended public meetings at which Boeing, local government and tribal officials, community and non-profit organizations, and individual stakeholders

4

provided comments, the Regional Board adopted the current permit on October 19, 2023.  It became effective on January 1, 2024 (the 2024 permit).

This case concerns two specific conditions of the 2024 permit.

### 1.    *PCB monitoring*

PCBs—an acronym for polychlorinated biphenyls— "are a group of man-made organic chemicals" that "were manufactured in the United States" starting in 1929 and were used in "hundreds of industrial and commercial applications" including "military and defense" work, until PCBs were banned in 1979. They are "highly persistent in the environment" and can cause acute chronic health effects.  PCBs "generally occur as mixtures of congeners," with "the most common commercial mixtures" being "aroclors."

While the prior permit required Boeing to monitor the aroclors (that is, the mixtures) using a testing method known as Method 608.3, the 2024 permit requires Boeing to monitor PCBs "as aroclors" using Method 608.3 *and* to monitor PCBs "as congeners" (that is, the underlying components) using "[M]ethod 1668C or . . . a high resolution EPA-approved method."  With regard to the PCB monitoring requirement generally (but not with regard to the new congeners requirement specifically), the Regional Board explained that PCB data is "important" to monitor "for informational purposes" due to "changes in the nature and quality of stormwater discharges" as "more intense storm events and increased frequency of wildfires" occur as a result of climate change.  The Regional Board had also received a public comment noting that groups monitoring the Los Angeles River using a congener analysis had tracked PCBs "well above

5

the human health criterion." The Regional Board did not examine, or otherwise engage in any balancing, as to whether the additional PCB congener monitoring requirement bore a reasonable relationship to what it estimated were the costs of that requirement.[2]

### 2. *Aluminum effluent limitation*

While the prior permit required Boeing merely to monitor aluminum levels in the stormwater, the 2024 permit imposes an effluent limitation for aluminum that requires Boeing to ensure—by treatment or otherwise—that the concentration of aluminum in the stormwater discharge does not exceed 1 mg/L.

The Regional Board based this new requirement on evidence of nine separate exceedances of aluminum reported at various outfalls on the site during the term of the prior permit, and on knowledge that aluminum had a historical "industrial application" as "a component in solid rocket propellants" and as "a building material for space shuttles and equipment."

### C. *Administrative exhaustion*

Boeing submitted written and oral comments to the draft 2024 permit objecting to the additional PCB monitoring requirement and to the aluminum effluent limitation. After the 2024 permit was adopted, Boeing exhausted its administrative remedies by presenting a petition for review to the Regional

---

[2] The Board had engaged in such a balancing analysis before imposing a different requirement—namely, an infiltration study to examine whether the unlined stormwater holding ponds should be redesigned to prevent pollutants from leaching out of the ponds and into the groundwater. Boeing challenged the imposition of this requirement in its writ petition, but the trial court denied that portion of the writ and Boeing has not appealed that ruling.

Board on November 11, 2023, which was deemed denied by the Regional Board's inaction on the petition.

## II. Trial Court Proceedings

### A. *Petition for writ of administrative mandate*

In December 2023, Boeing filed a petition for a writ of administrative mandate in the trial court seeking, as pertinent here, to "remove" the "conditions" in the 2024 permit requiring Boeing to (1) monitor PCBs using Method 1668C and (2) satisfy the aluminum effluent limitation.[3]  Boeing subsequently filed the operative, first amended petition.

### B. *Briefing*

The parties addressed Boeing's two challenges to the 2024 permit in their trial briefs.  As for the use of Method 1668C to monitor PCB congeners, Boeing argued that the Regional Board failed to balance the benefits against the burdens of that method as required by section 13267(b), while the Regional Board argued that the statute did not apply at all and that an adequate analysis was conducted even if the statute did apply.  As for the aluminum effluent limitation, Boeing argued that the evidence "decisively" showed that aluminum in the stormwater was a "naturally occurring constituent" rather than caused by any prior industrial activity, while the Regional Board argued that the evidence satisfied the standard of showing aluminum is "associated with" Boeing's activity at the site.

---

[3]    Boeing's petition challenged four other conditions in the permit.  The trial court granted the petition as to two of those conditions and denied the petition as to the other two conditions, but neither the Regional Board nor Boeing has challenged those rulings on appeal.

### C. *Ruling*

Following a hearing, the trial court on December 30, 2024, issued an order denying Boeing's writ petition. The court ruled that the additional PCB monitoring requirement was not invalid for failure to apply section 13267(b), because that section did not apply to the 2024 permit as a matter of statutory construction. The court also ruled that the Regional Board's findings justifying the aluminum effluent limitation were "supported by the weight of the evidence."

## III. Appeal

Boeing timely filed this appeal.

## DISCUSSION

A party aggrieved by an order of a regional board may obtain review in the trial court by filing a petition for writ of mandate. (§ 13330, subd. (b); *City of Duarte v. State Water Resources Control Bd.* (2021) 60 Cal.App.5th 258, 268 (*Duarte*).) A writ of mandate seeking review of an administrative agency's determination is appropriately granted when the agency has "prejudicial[ly] abuse[d] [its] discretion." (Code Civ. Proc., § 1094.5, subd. (b); *Malaga County Water Dist. v. Central Valley Regional Water Quality Control Bd.* (2020) 58 Cal.App.5th 418, 445 (*Malaga*).) The burden of showing both an abuse of discretion *and* prejudice rests upon Boeing, as the appealing party. (*Gooden v. County of Los Angeles* (2024) 106 Cal.App.5th 1, 14 (*Gooden*).)

In challenging the trial court's ruling that the Regional Board was not obligated under section 13267(b) to examine the benefits and burdens of Method 1668C for monitoring PCBs, Boeing challenges the trial court's interpretation of the Water Code; that is an issue we review de novo. (*Family Health Centers*

8

*of San Diego v. State Dept. of Health Care Services* (2021) 71
Cal.App.5th 88, 97.)  In challenging the trial court's ruling that,
in its independent judgment, the administrative record supported
the imposition of the aluminum effluent limitation (§ 13330,
subd. (e); Code Civ. Proc., § 1094.5, subd. (c)), Boeing challenges
the trial court's interpretation of the Water Code as well as the
trial court's factual findings.  We review the former de novo
(*Family Health*, at p. 97), and review the latter for substantial
evidence (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824
(*Fukuda*)), bearing in mind that a trial court's adoption of an
agency's factual findings enjoys a "strong presumption of
correctness" grounded in "deference" to the agency and its
"technical expertise." (*Barclay Hollander Corp. v. California
Regional Water Quality Control Bd.* (2019) 38 Cal.App.5th 479,
497; *Fukuda*, at p. 817; *Sweeney v. California Regional Water
Quality Control Bd.* (2021) 61 Cal.App.5th 1093, 1112 (*Sweeney*);
see also *Divers' Environmental Conservation Organization v.
State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246,
252 (*Divers*).)

## I.    Governing Law

The permit issued by the Regional Board in this case is
governed by a "complex" "web" of state and federal statutes and
regulations aimed at protecting the quality of our local and
national waters.  (*Burbank*, *supra*, 35 Cal.4th at p. 619; *City of
Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006)
135 Cal.App.4th 1377, 1380 (*Rancho Cucamonga*).)

### A.    *California's Porter-Cologne Water Quality Control Act*

In 1969, California enacted the Porter-Cologne Water
Quality Control Act (§ 13000 et seq.) (the Porter-Cologne Act) to

9

"attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (§ 13000; *Burbank*, *supra*, 35 Cal.4th at p. 619.) The State Water Resources Control Board and nine regional boards are the "principal state agencies charged with enforcing" the Porter-Cologne Act. (§ 13001; see § 13200, subd. (d) [Los Angeles region]; *Sweeney*, *supra*, 61 Cal.App.5th at p. 1113; *Burbank*, at p. 619; *Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875 (*Building Industry*).) They do so by creating "water quality control plans" (§ 13241) and "prescrib[ing] requirements as to the nature of any proposed discharge" that may affect water quality. (§ 13263, subd. (a); *Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 181 (*Coastal*); *Building Industry*, at p. 875; *Dept. of Finance v. Commission on State Mandates* (2017) 18 Cal.App.5th 661, 668 (*Dept. of Finance*).)

### B.     *The federal Clean Water Act*

After the enactment of the Porter-Cologne Act, Congress in 1972 enacted what is now known as the Clean Water Act (33 U.S.C. § 1251 et seq.).[4] (*Burbank*, *supra*, 35 Cal.4th at p. 625.) The goal of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by, aspirationally, eliminating all discharges of

---

4     The precursor law was codified in 1948 as the Federal Water Pollution Control Act. (*Building Industry*, *supra*, 124 Cal.App.4th at p. 872.)

pollutants in the United States by the year 1985. (33 U.S.C. § 1251(a).)

The Clean Water Act prohibits the discharge of pollutants from a "point source," such as the outfalls at the site here, into navigable waters of the United States unless the discharger has a permit. (33 U.S.C. § 1311(a); *Building Industry*, *supra*, 124 Cal.App.4th at pp. 872-873.) The National Pollutant Discharge Elimination System (NPDES) sets out the conditions under which a permit can be issued, including for discharges of stormwater runoff.[5] (33 U.S.C. § 1342(a) & (b); *Association to Protect Hammersley, ELD, and Totten Inlets v. Taylor Resources, Inc.* (9th Cir. 2002) 299 F.3d 1007, 1009 (*Hammersley*); *National Resources Defense Council, Inc. v. United States E.P.A.* (9th Cir. 1992) 966 F.2d 1292, 1295 (*NRDC*); *California Sportfishing Protection Alliance v. Shiloh Group, LLC* (N.D. 2017) 268 F.Supp.3d 1029, 1040 (*Sportfishing*) [NPDES permitting is the "'centerpiece'" of the Clean Water Act].)

### C. *Implementation of federal law in California*

The federal Clean Water Act empowers states to issue NPDES permits as long as the states' enforcement of water quality complies with the federal standards—that is, as long as the state-issued permit imposes water quality standards that are equal to or more stringent than the federal standards. (33 U.S.C. §§ 1342(a)-(b), 1370; § 13377; *Burbank*, *supra*, 35 Cal.4th at pp. 618, 620; *NRDC*, *supra*, 966 F.2d at p. 1295; *Dept. of Finance*,

---

[5] Federal law did not regulate stormwater discharges specifically until Congress amended the Clean Water Act in 1987. (33 U.S.C. § 1342(p); 40 C.F.R. § 122.1(a); *Divers*, *supra*, 145 Cal.App.4th at pp. 254-255; *Building Industry*, *supra*, 124 Cal.App.4th at p. 874.)

11

*supra*, 18 Cal.App.5th at p. 669; *Building Industry*, *supra*, 124 Cal.App.4th at p. 873.)  In 1972, California added Chapter 5.5 (§§ 13370-13389) to the Porter-Cologne Act, thereby empowering regional boards to issue permits that serve *both* as "waste discharge requirements" compliant with state law *and* NPDES permits compliant with federal law.[6]  (§ 13374; *Building Industry*, at p. 875.)  Although Chapter 5.5 was added to specifically address these dual permits, section 13372—which is part of Chapter 5.5—provides that the other provisions of the Porter-Cologne Act continue to "apply" to such permits "[t]o the extent" they are "consistent with the provisions" of Chapter 5.5.[7]  (§§ 13372, subd. (a), 13370, subd. (c); *Sweeney*, *supra*, 61 Cal.App.5th at p. 1113; *Burbank*, at p. 620; *Dept. of Finance*, at p. 669; *Building Industry*, at p. 875; cf. *Burbank*, at p. 626-627

---

**6**      The federal authorities subsequently authorized California to issue such permits.  (*Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749, 757.)

**7**      The full text of the statute states:  "This chapter shall be construed to ensure consistency with the requirements for state programs implementing the [Clean Water Act] and acts amendatory thereof or supplementary thereto.  To the extent other provisions of this division are consistent with the provisions of this chapter and with the requirements for state programs implementing the [Clean Water Act] and acts amendatory thereof or supplementary thereto, those provisions apply to actions and procedures provided for in this chapter.  The provisions of this chapter shall prevail over other provisions of this division to the extent of any inconsistency.  The provisions of this chapter apply only to actions required under the [Clean Water Act] and acts amendatory thereof or supplementary thereto."  (§ 13372, subd. (a).)

[California law cannot, "[under] the principles of federal supremacy," authorize the regional boards to issue permits that fail to comply with the "mandates of federal law"].)

## II. Analysis

### A. *Monitoring of PCB congeners using Method 1668C*

Boeing asserts that the requirement in the 2024 permit that it use Method 1668C to monitor PCB congeners must be removed because the Regional Board did not first balance the burdens of this additional monitoring requirement against its benefits, as required by section 13267(b).  This assertion requires us to examine (1) whether the Regional Board erred in failing to comply with section 13267(b), and if so, (2) whether the error was prejudicial.

#### 1. *The Regional Board erred in failing to comply with section 13267(b)*

Section 13267 empowers a regional board to "require that any person . . . who proposes to discharge waste within its region" "furnish . . . monitoring program reports."  (§ 13267, subd. (b).)  However, "[i]n requiring those reports," (1) "[t]he burden, including costs, of those reports [must] bear a reasonable relationship to the need for the report and the benefits to be obtained from the reports," and (2) the regional board must "[(a)] provide the person with a written explanation with regard to the need for [such] reports, and [(b)] identify the evidence that supports requiring th[e] person to provide the reports."  (*Ibid.*)  As noted above, section 13372 incorporates all other provisions of the Porter-Cologne Act—including section 13267—to apply to dual permits as long as those provisions are "consistent" with the provisions of Chapter 5.5.  In general, provisions are "consistent"

13

if they are "compatible," are not "conflicting," and are "capable of existing together without discord or disharmony." (See *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2008) 164 Cal.App.4th 1, 8-9.) Because section 13267(b)'s narrower duty to justify a monitoring requirement is "capable of existing together" with Chapter 5.5's broader duty that dual permits be at least as stringent as federal NPDES permits, section 13267(b) applies to the 2024 permit. (Accord, *Burbank, supra*, 35 Cal.4th at p. 625 [examining plain language of statutory text].)

The record is devoid of any evidence that the Regional Board complied with section 13267(b). Nothing in the record indicates that the Regional Board considered whether the burden, including costs, of the additional monitoring requirement bore a "reasonable relationship" to the benefits obtained from that requirement. Although we are to presume that agencies regularly perform their duties (*Duarte, supra*, 60 Cal.App.5th at p. 273), and although section 13267(b) does not obligate the Regional Board to explicitly "include any type of weighing or cost-benefit analysis" in the record (*Sweeney, supra*, 61 Cal.App.5th at p. 1115), the Regional Board elsewhere engaged in a detailed cost-benefit analysis when applying section 13267(b) to a different monitoring requirement in the 2024 permit (namely, with respect to investigating the lining of the stormwater holding ponds), but did not do so with respect to the PCB congeners monitoring requirement. In light of this differential treatment, we cannot infer or otherwise presume that the Regional Board engaged in the analysis required by section 13267(b). (Cf. *Sweeney*, at p. 1115 [inferring compliance where the record showed that the "Regional Board was aware of the requirement that the burden of reports be proportional to their anticipated

14

benefit"]; see *Rancho Cucamonga, supra*, 135 Cal.App.4th at p. 1386 [inferring compliance with section 13241's requirement that "economic factors" be considered where the record showed that the permit "was based on a fiscal analysis and a cost-benefit analysis"].)

Echoing the trial court's ruling, the Regional Board urges that section 13267(b) does not apply to the dual permit in this case. Specifically, the Regional Board argues that it issued the 2024 permit pursuant to the provisions of Chapter 5.5—more specifically, pursuant to section 13383—and that section 13383 empowers "regional boards" to "require any person . . . to establish and maintain monitoring . . . methods" but makes no mention of a requirement that the Regional Board examine the burdens and benefits of those methods. (§ 13383, subd. (b).) We reject this argument because it ignores that, as noted above, section 13372 incorporates into Chapter 5.5 all other mandates of the Porter-Cologne Act—including section 13267(b)—as long as they are not "[in]consistent" with Chapter 5.5 and, as we have concluded above, we discern no inconsistency.

The Regional Board resists our conclusion with three further arguments.

First, the Regional Board asserts that section 13383 applies whenever a permit allows for discharge into "navigable waters," and thus applies under different circumstances than section 13267(b), which applies only when a permit allows for discharge into state waters. This assertion makes no sense. The federal Clean Water Act only applies to discharges into navigable waters of the United States. (33 U.S.C. § 1251(a)(1); *City of Arcadia v. State Water Resources Control Bd.* (2005) 135 Cal.App.4th 1392, 1402.) By definition, a dual permit issued by a regional board

15

allows for discharge into *both* federal navigable waters and state waters.  If, as the Regional Board contends, section 13383's use of the term "navigable waters" subjects dual permits only to the provisions of Chapter 5.5 of the Porter-Cologne Act, then section 13372—and its mandate to apply all "consistent" provisions of the Porter-Cologne Act outside of Chapter 5.5—would be nullified.  We are not allowed to un-write statutes.  (*J.M. v. Huntington Beach Union High School Dist.* (2017) 2 Cal.5th 648, 655 (*J.M.*) ["'An interpretation that renders related provisions [of a statute] nugatory must be avoided'"].)

Second, the Regional Board asserts that section 13267(b)'s mandate does not apply because it is not "consistent" with the federal Clean Water Act, as it obligates a regional board to engage in the additional procedural step of examining the burdens and benefits of a monitoring requirement.  But requiring a regional board to engage in additional procedural steps does not, by itself, render a provision "inconsistent" with Chapter 5.5.  The provisions of the Porter-Cologne Act outside of Chapter 5.5 are replete with procedural steps a regional board must take; if *this* were enough to negate their application when considering a dual permit, then section 13372 would, again, be rendered a nullity.  (*J.M.*, *supra*, 2 Cal.5th at p. 655.)  What is more, we conclude that the two provisions specifically at issue here— section 13383 and section 13267(b)—are consistent:  Section 13383 limits a regional board to imposing monitoring duties "as may be *reasonably* required" (§ 13383, subd. (b), italics added), while section 13267(b) limits a regional board to imposing monitoring duties that "bear a *reasonable* relationship to the need for the [monitoring] report and the benefits to be obtained from the reports" (§ 13267, subd. (b), italics added).  Both

16

provisions obligate a regional board to act reasonably, and a monitoring duty with burdens grossly disproportionate to its benefits is not "reasonable."

Third, the Regional Board asserts that subdivision (c) of section 13383 explicitly cross-references subdivision (c) of section 13267, such that the absence of such a cross-reference to section 13267(b) in subdivision (b) of section 13383 means that section 13267(b) does not apply. We also reject this assertion. To be sure, the Regional Board is correct that subdivision (c) of section 13383, dealing with the power to inspect a dual permit holder's facilities, explicitly incorporates the inspection procedures found in subdivision (c) of section 13267. But this does not mean that any provision outside of Chapter 5.5 is inapplicable unless a provision within Chapter 5.5 makes an explicit cross reference. That is because section 13372 effects an across-the-board cross reference unless the provision to be applied is "inconsisten[t]" with Chapter 5.5. That our Legislature chose to adopt a belt-and-suspenders approach to section 13383, subdivision (c) does not give us warrant to negate section 13372. (*In re J.W.* (2002) 29 Cal.4th 200, 209 [statutory construction principles to "assume[] that every part of a statute serves a purpose and that nothing is superfluous" and "the expression of one thing in a statute ordinarily implies the exclusion of other things" do not apply if they "would defeat legislative intent or produce an absurd result"].)

2.      *Boeing has failed to demonstrate prejudice*

Relief is warranted on a petition for administrative mandate only if an agency's "abuse of discretion" is "prejudicial" (Code Civ. Proc., § 1094.5, subd. (b)), and Boeing—as the appellant—accordingly bears the burden of showing that the

17

Regional Board's failure to apply section 13267(b) was prejudicial. (*Gooden*, *supra*, 106 Cal.App.5th at p. 14 ["The burden of demonstrating a prejudicial abuse of discretion rests on the party challenging the agency's action"].)[8] The Regional Board's failure to examine the burdens and benefits of expanded monitoring of PCB congeners using Method 1668C or an alternative methodology is prejudicial only if that examination would have led the Regional Board not to impose the additional monitoring requirement. (*Malaga*, *supra*, 58 Cal.App.5th at pp. 445-446 [prejudice evaluated according to harmless error analysis].)

Boeing has not made this showing. Neither in its briefs nor when asked at oral argument did Boeing point to anything in the record indicating that the benefits of monitoring PCB congeners using Method 1668C are not proportional to the burdens, including costs, of that monitoring requirement; indeed, Boeing has not pointed to anything in the record delineating the costs of the additional monitoring. Boeing laments that the Regional Board refused to consider evidence submitted by Boeing of the "problems with Method 1668C," but fails to mention that this evidence was buried amid 140,000 pages of documents Boeing dumped on the Regional Board less than 48 hours before the final public meeting on the permit. The Regional Board was well within its rights to decline to consider Boeing's voluminous, late submission.

---

[8] We reject Boeing's argument that the Board's failure to undertake a section 13267(b) analysis excuses Boeing from having to show prejudice; the Board's error establishes the "abuse of discretion," but Boeing must still show prejudice.

18

Even if we consider this late-submitted evidence, Boeing at most attacks the efficacy of Method 1668C as a monitoring tool, suggesting that it is so poor a tool that its benefits are necessarily outweighed by the burdens it imposes, such that any balancing by the Regional Board would have led to a different outcome. For support, Boeing cites an opinion from the Washington Supreme Court upholding an agency's decision to not apply that method (*Puget Soundkeeper Alliance v. State, Department of Ecology* (Wash. 2018) 424 P.3d 1173, 1178) as well as comments from "industry groups" predictably critical of Method 1668C.[9] Boeing fails to acknowledge the evidence in the record on the other side of the ledger, including comments from an NPDES representative at the public hearing stating the Regional Board "appropriately" selected Method 1668C and other evidence from the EPA that several states were using Method 1668C with "good success." Because the contrary evidence indicating Method 1668C's validity constitutes substantial evidence, and because the requirement in the 2024 permit allows PCB monitoring through Method 1668C or any other "high resolution EPA-approved method," we reject Boeing's argument that there would have been a different outcome had the Regional Board applied section 13267(b). Because Boeing offers no further argument or evidence

---

[9] Boeing also urges that the EPA has endorsed a different method of monitoring PCBs called Method 1628 (90 Fed. Reg. 6967-6969), but this methodology was not endorsed until January 2025—long after the 2024 permit was issued. It does not in any event undermine the substantial evidence indicating that Method 1668C is valid.

in support of its position,[10] we conclude that the Regional Board's error was not prejudicial.

**B.** *Aluminum effluent limitation*

Boeing asserts that the aluminum effluent limitation contained in the 2024 permit is invalid.

1. *The effluent limitation is within the Regional Board's authority and supported by substantial evidence*

A regional board has the authority to set an effluent limitation for discharges of stormwater "associated with industrial activity" because such discharges can contain pollutants and the stormwater *itself* qualifies as a "pollutant."[11] (33 U.S.C. §§ 1342(p)(1), (p)(2)(B), (p)(3)(A), 1311, 1362(16); 40

---

[10] For the first time at oral argument, Boeing asserted that the more extensive PCB monitoring requirement imposes unreasonable costs upon Boeing because monitoring using Method 1668C might yield "false positives" of PCB levels that somehow trigger penalties. Boeing has waived this argument, both by failing to raise it in its briefs (*Kinney v. Vaccari* (1980) 27 Cal.3d 348, 356, fn. 6) and by failing to support, with legal authority or reasoned argument, the counter-intuitive portion of this argument that penalties might be imposed for reporting information about pollutants that are not otherwise subject to an effluent limitation (see *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956; *In re A.C.* (2017) 13 Cal.App.5th 661, 672).

[11] A "pollutant" is defined as, among other things, "biological material" that is "discharged into water" (33 U.S.C. § 1362(6)), while "pollution" is defined as a "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water" (33 U.S.C. § 1362(19)). We reject Boeing's attempts to conflate and collapse together the separately and distinctly defined terms.

C.F.R. §§ 122.44(d)(1)(i), 122.26(a)(1)(ii), (b)(14); *Sportfishing*, *supra*, 268 F.Supp.3d at p. 1040; *NRDC*, *supra*, 966 F.2d at p. 1296 [stormwater discharges "associated with industrial activity" are an exception to the moratorium on permitting requirements]; see also *Duarte*, *supra*, 60 Cal.App.5th at p. 270 [permits for "industrial activity" must satisfy effluent limitations]; *Puget Soundkeeper Alliance v. Whitley Mfg. Co.* (W.D. Wash. 2015) 145 F. Supp. 3d 1054, 1057 ["stormwater associated with industrial activity . . . *itself* is a pollutant subject to regulation under the [Clean Water Act]"], italics added.)  "Storm water discharge associated with industrial activity" is defined by federal regulation as "the discharge [of stormwater] from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant," and "includes, but is not limited to," "storm water discharges from industrial plant yards" and "areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water."  (40 C.F.R. § 122.26(b)(14).)  Because the Act itself requires only that a discharge of stormwater be "*associated* with industrial activity" and because the pertinent regulation requires only that the *conveyance* carrying the stormwater be directly related to present or past industrial activity, "[i]t is not necessary that storm water be contaminated or come into direct contact with [other] pollutants"; it is enough if the stormwater has "association with any type of industrial activity."  (*NRDC*, at p. 1304; *North Carolina Shellfish Growers Association v. Holly Ridge Associates, LLC* (E.D.N.C. 2003) 278 F.Supp.2d 654, 678-679; accord, *Hughey v. JMS Development Corp.* (11th Cir. 1996) 78 F.3d 1523, 1525, fn. 1 [stormwater constitutes a "pollutant"

21

whose discharge is subject to an effluent limitation if "rain water flows from a site where land disturbing activities have been conducted"].)

Substantial evidence supports the Regional Board's finding that stormwater flowing from the site is "associated with industrial activity." The record contains articles detailing how aluminum was used generally in the assembly and testing of rockets as well as evidence that rocket fuel containing aluminum was likely stored on the site and that aluminum may have been released during open burning on the site. The record also contains evidence that, during the term of the prior permit, the quantum of aluminum in the stormwater from the site exceeded water quality standards on nine separate occasions. What is more, the exceedances showed aluminum concentrations at different levels at the various outfalls. From this evidence, the Regional Board could reasonably infer that the unevenly distributed exceedances of aluminum in the stormwater flowing over the site was associated with the past industrial use of aluminum at the site.

2.    *Boeing's challenges*

Boeing makes what boil down to two attacks on the Regional Board's imposition of the effluent limitation for aluminum in the 2024 permit.[12]

First, Boeing asserts that the Regional Board applied the wrong legal standard in assessing whether the aluminum in the

---

[12]    Boeing makes a third attack, asserting that the Regional Board failed to conduct a "reasonable potential analysis" for aluminum, but the trial court ruled that Boeing did not exhaust its administrative remedies on this issue and Boeing does not

stormwater discharge from the site was "associated with industrial activity." Boeing urges that the requisite "association" occurs only if a regional board is able to affirmatively prove that the prior industrial activity "caused" the aluminum to be in the stormwater or that the aluminum was in the stormwater "because of" or "due to" the prior industrial activity.[13] In support of its proffered definition, Boeing points to case law equating an "association" with having a "close[] connect[ion]", and lifts phrases from the federal regulation defining "storm water discharge associated with industrial activity" (40 C.F.R. § 122.26(b)(14)).

We reject this argument for several reasons.

To begin, Congress could have made a regulator's authority to impose effluent limitations contingent upon an affirmative showing that past or present industrial activity "caused" pollutants to be in stormwater or that pollutants were in the stormwater "because of" or "due to" the industrial activity; Congress instead required only a showing that the stormwater discharge be "associated with industrial activity." We must give weight to this textual distinction. (*Jam v. International Finance Corp.* (2019) 586 U.S. 199, 209 ["'the legislative purpose is expressed by the ordinary meaning of the words used'"]; *In re Corrine W.* (2009) 45 Cal.4th 522, 529 ["the words the Legislature

_____

meaningfully challenge that ruling on appeal. The argument is accordingly waived.

13 Boeing goes on to argue that this standard is not met because the Regional Board never proved that industrial activity caused the aluminum in the stormwater because there was never proof that the aluminum used or stored at the site leaked into the soil and, thence, into the stormwater.

chose to enact are the most reliable indicator of its intent"].) Employing this more permissive threshold for regulatory authority is also not illogical as a matter of public policy. (See *Sportfishing*, *supra*, 268 F.Supp.3d at p. 1045 ["'if you own the leaky "faucet," you are responsible for its "drips"'"].)

The authority Boeing relies upon is unpersuasive. The cases Boeing cites are not to the contrary because they arise in a different context. (E.g., *Gordon v. Warner Bros. Pictures, Inc.* (1969) 269 Cal.App.2d 31, 37 [looking to dictionary to define "associated with" as meaning "closely connected" in context of whether unfair competition exists for using a book's title for a movie]; *Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 383 [examining meaning of the phrase "related to" in context of federal preemption by the Federal Deregulation Act of 1978].) Nor is the federal regulation Boeing cites to the contrary. As noted above, that regulation defines "[s]torm water discharge associated with industrial activity" as "discharge from any conveyance that is used for collecting and conveying storm water and that is *directly related* to manufacturing, processing or raw materials storage areas at an industrial plant" and "includes" "areas where industrial activity has taken place in the past and significant materials *remain* and are exposed to storm water." (40 C.F.R. § 122.26(b)(14), italics added.) Boeing urges that the phrase "directly related" demands a direct causal link between the industrial activity and the stormwater, but this argument ignores that the phrase containing "directly related" modifies the word "conveyance" rather than the term "stormwater"; the Ninth Circuit in *NRDC*, *supra*, 966 F.2d at pp. 1304-1305 rejected the assertion that the "directly related" language imposes any higher causal standard. Boeing invites us to reject *NRDC*, but proffers

24

no persuasive reason to do so. Boeing urges that the term "remains" implies that *people* placed the offensive chemical in the path of the stormwater runoff, but that phrase refers to what remains in the "area[] where [the] industrial activity has taken place" (40 C.F.R. § 122.26(b)(14)), and thus does not demand a causal link between the activity and the stormwater itself.

Second, Boeing argues that, even if the Regional Board applied the proper standard for assessing whether aluminum in the site's stormwater is "associated with industrial activity," substantial evidence does not support such a finding because an expert panel retained for the site[14] reported in 2022-2023, and one of the panel's members opined at a public hearing, that the concentration of aluminum was no different than the concentration that "naturally occur[s]" in the soil at the site, such that imposing an effluent limitation for aluminum is effectively requiring Boeing to "clean[] up nature itself." (*Hammersley*, *supra*, 299 F.3d at pp. 1016-1017 ["pollutants" also include "biological materials"—in that case, mussel feces—only if they have been "transformed by human activity"].) However, the administrative record also contains evidence to the contrary—namely, that the nine exceedances in aluminum levels at the site were not evenly distributed geographically (five of the nine were located at a specific outfall), and that the aluminum levels recorded in those exceedances varied. If the aluminum was endemic to the soil, one would expect it to be more evenly distributed geographically and to be consistent in concentration.

---

14    In 2015, Boeing "agreed to maintain" a "Surface Water Expert Panel" that provides input for Boeing's "annual reports" to the Regional Board describing "monitoring results" and other data from the site.

25

These variances support the Regional Board staff's opinion that the reported aluminum was not "naturally occurring" at the site. (See *Rancho Cucamonga, supra*, 135 Cal.App.4th at p. 1387 [opinion of agency staff may constitute substantial evidence].) Boeing effectively argues that *its* evidence is more persuasive than the Regional Board's, but this argument misapprehends substantial evidence review—which requires us to defer to an agency's decision in making one amply supported factual finding over another. (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 419-420 ["It is for the agency to weigh the preponderance of conflicting evidence, 'as we may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it'"].)[15]

---

[15] For similar reasons, Boeing's contention that the trial court applied an "improperly heightened standard of proof" is without merit. Although the trial court stated in its ruling that the expert panel's opinion did not "conclusively" establish that aluminum was naturally occurring, the court was doing no more than properly rejecting Boeing's assertion that the expert report should be given conclusive weight over the contrary evidence in the administrative record. Indeed, the trial court went on to find that the "weight of the evidence" supported the Regional Board's factual finding that aluminum was not naturally occurring— which is undoubtedly the proper standard to be applied by a trial court exercising its independent judgment when reviewing an administrative agency's ruling. (*Fukada, supra*, 20 Cal.4th at p. 817; *Coastal, supra*, 12 Cal.App.5th at p. 187.)

26

**DISPOSITION**

The order denying Boeing's petition for a writ of administrative mandate is affirmed.  The Regional Board is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P.J.
HOFFSTADT


We concur:


_____, J.
 MOOR


_____, J.
 KIM (D.)

27